**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| MICHAEL W. BEAUCHANE, *on behalf of himself and all others similarly situated*,<br><br>*Plaintiffs*,<br><br>**v.**<br><br>ELECTROSTIM MEDICAL SERVICES, INC., d/b/a EMSI,<br><br>*Defendants*, | Case No.:<br><br>**COMPLAINT – CLASS CLASS ACTION**<br><br>**JURY DEMAND** |

Plaintiff, Michael W. Beauchane ("Plaintiff"), individually, on behalf of himself and all others similarly situated, brings this action against Defendant ELECTROSTIM MEDICAL SERVICES, INC., d/b/a EMSI, and alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action seeking monetary damages and injunctive and declaratory relief from ELECTROSTIM MEDICAL SERVICES, INC., d/b/a EMSI ("EMSI"), arising from its failure to safeguard certain Personally Identifying Information[1] and Protected Health Information[2] (collectively, "PII") of scores of its patients. Consequently, a broad spectrum of those

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, Plaintiff is not asserting that every example of identifying information was compromised in the Data Breach.
[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected*

patients' PII—including their names, demographic information such as addresses, email and phone number(s), diagnoses, insurance information and subscriber number, and products prescribed and billed—has been compromised.[3]

2. According to its Notice of Data Security Event (EMSI's "Notice"), "[o]n or about May 13, 2023, EMSI became aware of unusual activity related to certain EMSI systems."[4] Upon investigating, EMSI "determined that an unknown actor gained access to certain parts of [its] network between April 27, 2023 and May 13, 2023…", which contained the confidential and sensitive PII for 542,990[5] current and former patients of EMSI (the "Data Breach").[6]

3. That means that cybercriminals infiltrated EMSI's data systems on April 27, 2023, and had *sixteen days* to exfiltrate the sensitive and confidential PII therein before they escaped unscathed—until on or about May 13, 2023. Sixteen days is an eternity for cybercriminals to have unfettered access to a covered entity's data systems, as evidenced by the scores of patients whose PII they managed to pilfer.

4. Even though EMSI claims it discovered the Data Breach on or about May 13, 2023, upon information and belief, it did not report the Data Breach to consumers or to regulators such

---

*health information*. A "covered entity" is further defined as, *inter alia*, a health care provider who transmits any health information in electronic form in connection with a transaction covered by HIPAA. *Id. Covered entity*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa /for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). EMSI is clearly a "covered entity" and the data compromised in the Data Breach that this action arises out of is "protected health information", subject to HIPAA.

[3] *Notice of Data Security Event*, ELECTROSTIM MED. SERVS., INC., *available at* https://www.wecontrolpain.com/assets/docs/notices/data-security-event-notice.pdf, (last accessed Jan. 29, 2024). Plaintiff also received a similar letter from EMSI, which is attached hereto.

[4] *Ibid.*

[5] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. DEP'T OF HEALTH & HUMAN SERVS. OFF. FOR CIVIL RIGHTS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, (last accessed Jan. 29, 2024).

[6] *Notice of Data Security Event*, *supra* note 3.

as the Office of the Vermont Attorney General until *more than seven months later*, on or about December 28, 2023.[7]

5. As will be more fully explained below, Plaintiff and members of the Class have been significantly injured by the Data Breach and have incurred out-of-pocket expenses associated with the reasonable mitigation measures they were forced to employ. Plaintiff and the Class also now forever face an amplified risk of fraud and identity theft due to their sensitive PII falling into the hands of cybercriminals.

6. On behalf of himself and the Class preliminarily defined below, Plaintiff brings causes of action sounding in negligence, *per se* negligence, invasion of privacy, breach of confidence, breach of contract, including breach of the covenant of good faith and fair dealing, trespass to chattels, bailment, unjust enrichment, and conversion. Plaintiff seeks damages and injunctive and declaratory relief arising from EMSI's failure to adequately protect his highly sensitive PII.

## PARTIES

7. Plaintiff Michael W. Beauchane is a natural person and resident of Greenbrier, Tennessee, where he intends to remain. Plaintiff received medical devices and related services from EMSI. Plaintiff's PII was stored on EMSI's data systems at all times material hereto. Plaintiff received a Notice Letter from EMSI informing him that he was a victim of the Data Breach, which is annexed hereto.

8. Defendant Electrostim Medical Services, Inc., d/b/a EMSI is a Florida Profit Corporation which provides medical devices and related services, and its principal place of business is located at 3504 Cragmont Dr., Suite 100, Tampa, Florida 33619.

---

[7] *See Privacy and Data Security | Office of the Vermont Attorney General*, OFF. OF THE VT. ATT'Y GEN., *available at* http://ago.vermont.gov/document/2023-12-28-electrostim-medical-services-data-breach-notice-consumers, (last accessed Jan. 29, 2024). Indeed, since EMSI notified the Office of the Vermont Attorney General of the Data Breach, that means that EMSI has "establishe[d] that misuse of personally identifiable information… is… reasonably possible…" because of the Data Breach. 9 V.S.A. § 2435(d)(1).

## JURISDICTION

9. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because it is brought on behalf of a proposed class with at least 100 members for whom the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and Plaintiff and other members of the class are citizens of a State and/or States different from EMSI.

10. This Court has specific personal jurisdiction over EMSI because this Action arises from a business transaction between Plaintiff and EMSI that was consummated in the State of Tennessee, and from EMSI providing medical devices and related services to Plaintiff in the State of Tennessee.

## VENUE

11. Venue is proper in this Court under 28 U.S.C. §§ 1391(a)(2), (b)(2) & (c)(2) because a substantial part of the events giving rise to the claims arise from EMSI's business activities in this District.

## FACTUAL ALLEGATIONS

**A. Plaintiff and the Class Members entrusted their PII to EMSI**

12. Plaintiff and the members of the Class are individuals who entrusted their PII to EMSI.

13. As a condition for receiving medical devices and related services, Class members were required by EMSI to confide and make available to it, its agents, and its employees, sensitive and confidential PII, including, but not limited to, names, demographic information such as addresses, email and phone number(s), diagnoses, insurance information and subscriber number, and products prescribed and billed.

14. EMSI acquired, collected, and stored a massive amount of PII of Class members.

15. By obtaining, collecting, using, and deriving a benefit from those individuals' PII, EMSI assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their PII from unauthorized disclosure.

16. Plaintiff has taken reasonable steps to maintain the confidentiality of his PII. Plaintiff relied on EMSI to keep that PII confidential and securely maintained, to use that information for business purposes only, and to make only authorized disclosures of that information.

17. Indeed, EMSI maintains a policy which specifically acknowledges its legal obligation to maintain the privacy of patient PII entrusted to it and to only disclose such information under limited circumstances, none of which were present here.

18. EMSI's policy is outlined in its Privacy Policy (EMSI's "Privacy Policy"), which was last updated on October 1, 2013, wherein EMSI represented and pledged:

> **OUR PLEDGE REGARDING MEDICAL INFORMATION:**
> We understand that medical information about you and your health is personal. Protecting medical information about you is important. We create a record of the care and services you receive. We need this record to provide you with quality care and to comply with certain legal requirements. This notice applies to all of the records of your care generated by EMSI, whether made by health care professionals or other personnel. This notice will tell you about the ways in which we may use and disclose medical information about you. We also describe your rights and certain obligations we have regarding the use and disclosure of medical information. We are required by law to:
> - keep medical information that identifies you private;
> - give you this notice of our legal duties and privacy practices with respect to medical information about you; and
> - follow the terms of the notice that is currently in effect.

[8]

19. EMSI's Privacy Policy goes on to circumscribe the way patients' PII can and cannot be disclosed to, inter alia, third parties.[9] The Data Breach that is the subject of this civil action is not contemplated or permitted by EMSI's Privacy Policy.[10]

20. Plaintiff entrusted his PII to EMSI solely for the purpose of attaining medical device(s) and related services and arranging the payment therefor with the expectation and implied mutual understanding that EMSI would strictly maintain the confidentiality of that information and safeguard it from theft or misuse.

21. Plaintiff would not have entrusted EMSI with that highly sensitive PII if he had known that EMSI would not maintain it securely and protect it from unauthorized use or disclosure.

**B. The security of patients' PII was compromised in the Data Breach**

22. Plaintiff was a patient of EMSI.

---

[8] *Privacy Policy – EMSI*, ELECTROSTIM MED. SERVS., INC., *available at* https://www.wecontrolpain.com/privacy-policy, (Oct. 1, 2013).
[9] *See Ibid.*
[10] *See Ibid.*

23. Prior to and/or contemporaneously with utilizing EMSI's services, its agents provided Plaintiff with various disclosure statements regarding its obligations under HIPAA to safeguard patients' PII–as EMSI was required to do by law.[11]

24. As a prerequisite to receiving those services from EMSI, Plaintiff divulged his personal and sensitive PII to it, with the implicit understanding that it would be kept confidential. This understanding was based on all the facts and circumstances attendant to his receipt of care, and the express, specific, written representations made by EMSI and its agents in its Privacy Policy and elsewhere.

25. Plaintiff reasonably relied upon EMSI's representations to his detriment and would not have provided his sensitive PII to EMSI but for EMSI's explicit and implicit promises to adequately safeguard that information.

26. On or about December 28, 2023, EMSI notified Plaintiff and all Class members that their PII had been compromised during the Data Breach.[12]

27. According to EMSI, "[o]n or about May 13, 2023, EMSI became aware of unusual activity related to certain EMSI systems."[13] Then EMSI "determined that an unknown actor gained access to certain parts of [its] network between April 27, 2023 and May 13, 2023…"[14]

28. EMSI further explained that the unknown actor(s) gained access to a panoply of sensitive and confidential PII including names, demographic information such as addresses, email and phone number(s), diagnoses, insurance information and subscriber number, and products prescribed and billed.[15]

29. As a result of the Data Breach, the PII for 542,990 current and former EMSI patients was compromised.[16]

---

[11] *See, e.g.*, 45 C.F.R. § 164.520(c)(2)(iii)(B).
[12] *See, e.g.*, *Notice of EMSI Data Security Event*, *supra* note 3.
[13] *Ibid.*
[14] *Ibid.*
[15] *Ibid.*
[16] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. DEP'T OF HEALTH & HUMAN SERVS. OFF. FOR CIVIL RIGHTS,

30. EMSI's Notice did not explain how the Data Breach happened, who perpetrated it, whether a ransom was demanded or paid, or when EMSI discovered that their data systems had been infiltrated.

31. Further, upon information and belief, it appears that EMSI became aware of the Data Breach on or about May 13, 2023, yet it neglected to inform Plaintiff and the Class until more than seven months later, on or about December 28, 2023.

32. The Data Breach was preventable and a direct result of EMSI's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patients' PII.

33. According to the University of Illinois Chicago ("UIC"), "[t]o improve cybersecurity in healthcare, organizations need to hire informatics professionals who can not only collect, manage and leverage data, but protect it as well."[17]

34. UIC has identified several strategies and best practices that, at a minimum, should be implemented by healthcare providers like EMSI, including but not limited to: establishing a security culture; protecting mobile devices; thoroughly educating all employees; strong passwords that need to be changed regularly; multi-layer security, including firewalls, anti-virus, and anti-malware software; limiting network access; controlling physical access to devices; encryption; making data unreadable without a password or key; multi-factor authentication; backup data; and limiting employees access to sensitive and protected data.[18]

35. Numerous industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security ("CIS") released its Critical Security Controls, and all healthcare institutions are strongly advised to follow these guidelines.[19]

---

https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, (last accessed Jan. 26, 2024).

[17] *Cybersecurity: How Can It Be Improved in Health Care?*, HEALTH INFORMATICS-UNIVERSITY OF ILLINOIS CHICAGO, *available at* https://healthinformatics.uic.edu/blog/cybersecurity-how-can-it-be-improved-in-health-care/, (last accessed Dec. 7, 2022).

[18] *Ibid*.

[19] *CIS Benchmarks FAQ*, CTR. FOR INTERNET SEC., *available at* https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/, (last accessed June 7, 2022).

36. Other cybersecurity best practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and the protection of physical security systems; protecting against any possible communication system; and training staff regarding critical points.

37. Upon information and belief, EMSI failed to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the CIS's Critical Security Controls, which are established frameworks for reasonable cybersecurity readiness.

**C. Healthcare providers like EMSI are a prime target for cybercriminals**

38. Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015.[20] The next year, that number increased by nearly 50%.[21] The following year, the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[22]

39. Covered entities "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[23]

---

[20] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, IDENTITY THEFT RESOURCE CENTER ("ITRC") (Jan. 19, 2017), https://www.idtheftcenter.org/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout/.

[21] *2017 Annual Data Breach Year-End Review*, ITRC, (Jan. 25, 2018), https://www.idtheftcenter.org/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf.

[22] *2018 End-of-Year Data Breach Report*, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[23] Benishti, Eyal, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL

40. The PII stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach—names, demographic information such as addresses, email and phone number(s), diagnoses, insurance information and subscriber number, and products prescribed and billed —is difficult, if not impossible, to change.

41. This data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information… [is] worth more than 10x on the black market."[24] Likewise, the FBI has warned healthcare organizations that PII data is worth 10 times as much as personal credit card data on the black market.[25]

42. PII data for sale is so valuable because PII is so broad, and it can therefore be used for a wide variety of criminal activity such as creating fake IDs, buying medical equipment and drugs that can be resold on the street, or combining patient numbers with false provider numbers to file fake claims with insurers.

43. The value of Plaintiff's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and

---

HEALTH, (Apr. 4, 2019), https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

[24] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[25] Stolen PHI health credentials can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924. Dark web monitoring is a commercially available service which, at a minimum, EMSI can and should perform (or hire a third-party expert to perform).

directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

44. As storehouses of that lucrative information, covered entities are also highly targeted by cybercriminals because, "primarily due to budget and resources, [their] security systems are often less sophisticated and decentralized than those in other industries, such as financial services," making them an easier target.[26]

**D. EMSI failed to sufficiently protect the PII that patients had entrusted to it**

i. EMSI failed to adhere to HIPAA

45. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[27]

46. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII is properly maintained.[28]

47. EMSI's Data Breach resulted from a combination of inadequacies showing it failed to comply with safeguards mandated by HIPAA. Upon information and belief, EMSI's security failures include, but are not limited to:

a. Failing to ensure the confidentiality and integrity of electronic PII that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

[26] Benishti, *supra* note 23.
[27] *See* n.2, *supra*.
[28] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

b. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PII in violation of 45 C.F.R. § 164.306(a)(2);

c. Failing to protect against any reasonably anticipated uses or disclosures of electronic PII that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by EMSI's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Failing to effectively train all staff members on the policies and procedures with respect to PII as necessary and appropriate for staff members to carry out their functions and to maintain security of PII in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PII, in compliance with 45 C.F.R. § 164.530(c).

ii. EMSI failed to adhere to FTC guidelines

48. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[29] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as EMSI, should employ to protect against the unlawful exposure of PII.

49. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[30] The guidelines explain that businesses should:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

50. The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[31]

51. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and

---

[29] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Sep. 2, 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[30] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Sep. 28, 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[31] *See Start with Security*, *supra* note 29.

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52. EMSI's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

iii. <u>EMSI failed to adhere to industry standards</u>

53. As stated above, the healthcare industry continues to be a high value target among cybercriminals. In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches).[32] The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[33] As a result, both the government and private sector have developed industry best standards to address this growing problem.

54. The United States Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that, "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."[34] DHHS highlights "several basic cybersecurity safeguards that can be implemented to improve cyber resilience which only require a relatively small financial investment, yet they can have a major

---

[32] 2018 End of Year Data Brach Report, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/ wp-content/uploads/2019/02/ITRC_2018-End-of-Year Aftermath_FINAL_V2_ combinedWEB.pdf.
[33] *Id.*
[34] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

impact on an organization's cybersecurity posture."[35] Most notably, organizations must properly encrypt PII in order to mitigate against misuse.

55. The private sector has similarly identified the healthcare sector as particularly vulnerable to cyber-attacks both because of the of value of the PII that it maintains and because, as an industry, it has been slow to adapt and respond to cybersecurity threats.[36]

56. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, EMSI failed to adopt sufficient data security processes, a fact highlighted by the fact that it did not detect the Data Breach for more than two weeks after it happened.

57. EMSI failed to adequately train its employees on even the most basic of cybersecurity protocols, which could have prevented the Data Breach.

58. EMSI's failure to implement these rudimentary measures made it an easy target for the Data Breach that came to pass.

**E. <u>Plaintiff and the Class Members were significantly harmed by the Data Breach</u>**

59. As discussed above, PII is among the most sensitive, and personally damaging information. A report focusing on breaches in the healthcare industry found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000.00" per person, and that the victims were further routinely forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage.[37]

60. Victims of medical identity theft can suffer significant financial consequences. "In some cases, they [must pay] the healthcare provider, repa[y] the insurer for services obtained by

---

[35] *Id.*
[36] *10 Cyber Security Best Practices For the Healthcare Industry*, NTIVA (Jun. 19, 2018), https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry.
[37] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

the thief, or . . . engage[] an identity service provider or legal counsel to help resolve the incident and prevent future fraud."[38]

61. Moreover, nearly half of identity theft victims lost their health care coverage as a result of a data breach incident, nearly one-third reported that their premiums went up, and forty percent never resolved their identity theft at all.[39]

62. "Unfortunately, by the time medical identity theft is discovered, the damage has been done. Forty percent of consumers say that they found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that thieves incurred in their name. As a result, the consequences of medical identity theft are frequently severe, stressful and expensive to resolve."[40]

63. Moreover, resolution of medical identity theft is time consuming to remedy. "Due to HIPAA privacy regulations, victims of medical identity theft must be involved in the resolution of the crime. In many cases, victims struggle to reach resolution following a medical identity theft incident."[41] Consequently, they remain at "risk for further theft or errors in [their] healthcare records that could jeopardize medical treatments and diagnosis."[42]

64. As a result of the Data Breach, Plaintiff now faces, and will continue to face, a heightened risk of identity theft and fraud for the rest of his life.

65. As a long-standing member of the healthcare community, EMSI knew or should have known the importance of safeguarding patient PII entrusted to it and of the foreseeable consequences of a breach. Despite this knowledge, however, EMSI failed to take adequate cyber-security measures to prevent the Data Breach from happening.

---

[38] *Fifth Annual Study on Medical Identity Theft*, PONEMON INSTITUTE LLC 1 (Nov. 18, 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65.
[39] *Id.*
[40] *The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches*, EXPERIAN (Apr. 13, 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[41] *Id.*
[42] *Id.*

66. EMSI has not provided any compensation to patients victimized in the Data Breach and has not offered to provide any assistance or compensation for the costs and burdens—current and future—associated with the identity theft and fraud resulting from the Data Breach.

67. Even if EMSI did reimburse Plaintiff for the harm he suffered, it is incorrect to assume that reimbursing a victim of the Data Breach for financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[43]

68. As a result of EMSI's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer significant damages. They have suffered or are at increased risk of suffering:

a. The loss of the opportunity to control how their PII is used;

b. The diminution in value of their PII;

c. The compromise, publication and/or theft of their PII;

d. Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud, including the purchase of identity theft protection insurance and detection services;

e. Lost opportunity costs and lost wages associated with the time and effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

---

[43] *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUSTICE 10, 11 (Jan. 27, 2014), https://www.bjs.gov/content/pub/pdf/vit12.pdf.

g. Unauthorized use of stolen PII;

h. The continued risk to their PII, which remains in the possession of EMSI and is subject to further breaches so long as EMSI fails to undertake appropriate measures to protect the PII in their possession; and

i. Current and future costs related to the time, effort, and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members.

69. Plaintiff has already incurred harm as a result of the Data Breach.

70. For example, to mitigate the heightened risk of identity theft and fraud that he now faces, Plaintiff has subscribed to a paid online credit monitoring service through Allstate Identity Protection. While this credit monitoring service allows him to monitor his credit reports to determine whether suspicious activity has occurred, it is powerless to stop identity theft in advance and does not indemnify him from, or insure him against, the harm caused by the Data Breach.

71. Plaintiff has also been forced, and will continue to be forced, to expend time and effort in order to mitigate the harm he has suffered on account of the Data Breach.

72. For example, Plaintiff has expended considerable time and effort attempting to contact EMSI and monitoring his identity and credit reports periodically, in addition to gathering documentation.

## CLASS ACTION ALLEGATIONS

73. Plaintiff brings this action on behalf of himself and as a class action on behalf of the following proposed class and subclass (collectively, "the Class"):

> (Nationwide Class) All individuals whose PII was compromised in EMSI's Data Breach.
>
> (Tennessee Subclass) All citizens of the State of Tennessee whose PII was compromised in EMSI's Data Breach.

74. Excluded from the Class are the officers, directors, and legal representatives of EMSI and the judges and court personnel in this case and any members of their immediate families.

75. This action is properly maintainable as a class action under Fed. R. Civ. Proc. 23 and the case law thereunder.

76. The Class is so numerous that joinder of all members would be impracticable. Upon information and belief, the Class consists of more than five-hundred thousand members, spread across numerous states.

77. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether and to what extent EMSI had a duty to protect the PII of Plaintiff and the Class;

b. Whether EMSI failed to adopt the practices and procedures necessary to adequately safeguard the information compromised in the Data Breach;

c. Whether EMSI adequately and accurately informed Class Members that their PII had been compromised;

d. Whether Class Members are entitled to actual damages, statutory damages, and/or punitive damages as a result of EMSI's wrongful conduct; and

e. Whether Plaintiff and the Class are entitled to restitution as a result of EMSI's wrongful conduct.

78. Plaintiff's claims are typical of those of other Class members because his PII, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiff, like all Class members, was injured by EMSI's uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of other Class members arise from the same operative facts and are based on the same legal theories.

79. Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

80. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the questions identified in Paragraph 77 above.

81. A class action would provide substantial benefits over other methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

82. The litigation of the claims brought herein is manageable. EMSI's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

83. Adequate notice can be given to Class members directly using information maintained in EMSI's records.

84. This proposed class action does not present any unique management difficulties.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## NEGLIGENCE and/or NEGLIGENCE *Per Se*

85. Plaintiff repeats and incorporate by reference the preceding paragraphs.

86. As a condition of receiving medical devices and related services, Plaintiff and Class members were obligated to provide EMSI with their PII.

87. Plaintiff and the Class members entrusted their PII to EMSI with the understanding that EMSI would safeguard it.

88. EMSI had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class members could and would suffer if their PII was wrongfully disclosed.

89. EMSI had a duty to exercise ordinary and reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, *inter alia*, designing, maintaining and testing EMSI's security protocols to ensure that Plaintiff's and Class members' PII in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately trained on cyber security measures regarding patient PII.

90. Plaintiff and the Class members were the foreseeable and probable victims of any inadequate security practices and procedures that EMSI employed. EMSI knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, that it had inadequately trained its employees, and that its security protocols were insufficient to secure the PII of Plaintiff and Class members.

91. EMSI's own conduct created a foreseeable risk of harm to Plaintiff and Class members. EMSI's misconduct included, but was not limited to, its failure to take the steps to prevent the Data Breach as set forth herein. EMSI's misconduct also included its decision to not comply with industry standards for the safekeeping of patient PII.

92. Section 5 of the FTC Act prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as EMSI, of failing to use reasonable measures to protect PII/PHI. The FTC publications and orders described above also form part of the basis of EMSI's duty in this regard.

93. EMSI further violated Section 5 of the FTC Act by failing to use reasonable measures to protect patient PII/PHI and not complying with applicable industry standards, as described herein. EMSI's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class members.

94. EMSI further violated the standard of care created by HIPAA, for the reasons as more fully explained, *ante*.

95. Plaintiff and the Class members had no ability to protect their PII once they entrusted it to EMSI.

96. EMSI has admitted that Plaintiff's and the Class members' PII was wrongfully disclosed to cybercriminals because of the Data Breach.

97. EMSI breached its duty to Plaintiff and the Class by failing to exercise ordinary and reasonable care in protecting and safeguarding their PII while it was within EMSI's possession or control.

98. EMSI unlawfully breached its duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent unauthorized dissemination of its patients' PII.

99. EMSI also unlawfully breached its duty to adequately disclose to Plaintiff and Class members the existence and scope of the Data Breach.

100. But for EMSI's wrongful and negligent breach of duties owed to Plaintiff and Class members, Plaintiff's and Class Members' PII/PHI would not have been compromised.

101. As a result of EMSI's negligence, Plaintiff and the Class have suffered and will continue to suffer damages and injury including, but not limited to, out-of-pocket expenses

associated with mitigating against the heightened risk of identity theft and fraud caused by the Data Breach; the time and costs associated with remedying identity theft and fraud fairly attributable to the Data Breach; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

102. These harms are directly and proximately caused by the Data Breach.

## SECOND CLAIM FOR RELIEF

## INVASION OF PRIVACY

103. Plaintiff repeats and incorporates by reference the preceding paragraphs.

104. Plaintiff and Class members took reasonable and appropriate steps to keep their PII confidential from the public.

105. Plaintiff's and Class members' efforts to safeguard their own PII were successful, as their PII was not known to the general public prior to the Data Breach.

106. Plaintiff and Class members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

107. EMSI owed a duty to its patients, including Plaintiff and Class members, to keep their PII confidential.

108. The unauthorized release of PII, especially PHI, is highly offensive to a reasonable person.

109. Plaintiff's and Class members' PII is not of legitimate concern to the public.

110. EMSI knew or should have known that Plaintiff's and Class members' PII was private, as EMSI is a "covered entity" subject to HIPAA.

111. EMSI publicized Plaintiff's and Class members' PII, by communicating it to cyber criminals who had no legitimate interest in this PII and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web.

112. Indeed, not only is Plaintiff's and Class members' PII traveling the dark web, but it is being used to commit fraud; it is being disseminated amongst, *inter alia*, merchants, creditors, health care providers and governmental agencies.

113. It is therefore substantially certain that the Plaintiff's and the Class members' PII is rapidly becoming public knowledge – among the cybercriminal community writ large – due to the nature of the Data Breach that procured it, and the identity theft that it is designed for.

114. Unless and until enjoined, and restrained by order of this Court, EMSI's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that EMSI's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class members' privacy by EMSI.

## THIRD CLAIM FOR RELIEF

## BREACH OF CONFIDENCE

115. Plaintiff repeats and incorporate by reference the preceding paragraphs.

116. Plaintiff and Class members conveyed confidential and novel information to EMSI, their PII.

117. EMSI had knowledge that the PII was disclosed to it in confidence.

118. There was an understanding between EMSI and Plaintiff and Class members that the confidence of their PII be maintained.

119. EMSI breached the confidences Plaintiff and Class members formed with it by disclosing their PII to cybercriminals.

120. Unless and until enjoined, and restrained by order of this Court, EMSI's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that EMSI's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further breaches of confidence by EMSI.

## FOURTH CLAIM FOR RELIEF

## BREACH OF CONTRACT INCLUDING THE COVENANT OF GOOD FAITH AND FAIR DEALING

121. Plaintiff repeats and incorporates by reference the preceding paragraphs.

122. EMSI offered to provide medical devices and related services to Plaintiff and Class members in exchange for payment.

123. Plaintiff and the Class accepted EMSI's offer to provide medical devices and related services by paying for them and receiving said services.

124. EMSI required Plaintiff and Class members to provide their PII, including names, demographic information such as addresses, email and phone number(s), diagnoses, insurance information and subscriber number, and products prescribed and billed in order to receive services from EMSI.

125. Plaintiff and Class members exchanged valuable consideration – money – with EMSI for goods and services, a crucial part of which was EMSI's promise to protect their PII from unauthorized disclosure.

126. Necessarily implicit in the agreement between EMSI and its patients, including Plaintiff and Class members, was EMSI's obligation to use such PII for business and treatment purposes only, to take reasonable steps to secure and safeguard that PII, and not make disclosures of the PII to unauthorized third parties.

127. Further implicit in the agreement, EMSI was obligated to provide Plaintiff and the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PII.

128. Plaintiff and the Class would not have entrusted their PII to EMSI in the absence of such agreement with EMSI.

129. EMSI materially breached the implied contract(s) they had entered with Plaintiff and Class members by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. EMSI further breached the implied contracts with Plaintiff and Class members by:

a. Failing to properly safeguard and protect Plaintiff's and Class members' PII;

b. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement by operation of law;

c. Failing to ensure the confidentiality and integrity of electronic PII that EMSI created, received, maintained and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

130. The damages sustained by Plaintiff and Class members as described above were the direct and proximate result of EMSI's material breaches of its agreements.

131. Plaintiff and Class members have performed as required under the relevant agreements, or such performance was waived by the conduct of EMSI.

132. Under the laws of Tennessee, good faith is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

133. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

134. EMSI failed to promptly advise Plaintiff and the Class of the Data Breach.

135. In these and other ways, EMSI violated its duty of good faith and fair dealing.

136. Plaintiff and members of the Class have sustained damages as a result of EMSI's breaches of the Contract, including breaches of the Contract through violations of the covenant of good faith and fair dealing.

**FIFTH CLAIM FOR RELIEF**

**TRESPASS TO CHATTELS**

137. Plaintiff repeats and incorporates by reference the preceding paragraphs.

138. Plaintiff and the Class entrusted their PII to EMSI with the understanding that it would keep that information confidential.

139. EMSI intentionally dispossessed the Plaintiff and the putative members of the Class of their PII and/or used or intermeddled with the Plaintiff and the putative members of the Class's possession of their PII, when it allowed cybercriminals to access it, going far beyond the bounds of any consent Plaintiff and the Class bestowed upon EMSI.

140. As explained at length above, Plaintiff and the Class members were damaged thereby.

**SIXTH CLAIM FOR RELIEF**

**BAILMENT**

141. Plaintiff repeats and incorporates by reference the preceding paragraphs.

142. Plaintiff, the Class, and EMSI contemplated a mutual benefit bailment when the Plaintiff and putative members of the Class transmitted their PII to EMSI solely for treatment and the payment thereof.

143. Plaintiff's and the Class's PII was transmitted to EMSI in trust for a specific purpose (treatment), with an implied contract that the trust was to be faithfully executed, and the PII was to be accounted for when the special purpose was accomplished.

144. EMSI was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiff's and the Class's PII.

145. Plaintiff's and the Class's PII was used for a different purpose than the Plaintiff and the Class intended, for a longer time period and/or in a different manner or place than the parties intended.

146. As explained at length above, Plaintiff and the Class were damaged thereby.

## SEVENTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

147. Plaintiff repeats and incorporates by reference the preceding paragraphs.

148. In the alternative to the claims alleged above, Plaintiff alleges that he has no adequate remedy at law and brings this unjust enrichment claim on behalf of himself and the Class Members.

149. Plaintiff and Class Members conferred a monetary benefit on EMSI in the form of payment for healthcare services. Plaintiff and Class Members also provided their PII to EMSI.

150. The money that Plaintiff and Class Members paid, directly or indirectly, to EMSI should have been used by it, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

151. As a result of EMSI's conduct described herein, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between healthcare services associated with the reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and the inadequate healthcare services without reasonable data privacy and security practices and procedures that they received.

152. Under principles of equity and good conscience, EMSI should not be permitted to retain money belonging to Plaintiff and Class Members because EMSI failed to use that money to implement the reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal and state law, and industry standards and best practices.

153. EMSI should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by EMSI.

154. A constructive trust should be imposed upon all unlawful or inequitable sums received by EMSI traceable to Plaintiff and Class Members.

## EIGHTH CLAIM FOR RELIEF

## CONVERSION

155. Plaintiff repeats and incorporates by reference the preceding paragraphs.

156. At all times relevant hereto, Plaintiff and Class Members had ownership rights to their PII.

157. EMSI engaged in the wrongful act of disposing of the PII by giving cyber criminals access to it.

158. As explained at length above, Plaintiff and the Class were damaged thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually, on behalf of himself, and all others similarly situated, requests the following relief:

A. An Order certifying this action as a class action and appointing Plaintiff as Class representative and his counsel as Class counsel;

B. A mandatory injunction directing EMSI to safeguard the PII of Plaintiff and the Class hereinafter adequately by implementing improved security procedures and measures;

C. A mandatory injunction requiring that EMSI provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII to unauthorized persons;

D. An award of compensatory, restitutionary, punitive, exemplary, and statutory damages, as permitted by law.

E. An award of attorneys' fees and costs;

F. An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law; and

G. Such other and further relief as this court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 2, 2024

Respectfully submitted,

/s/ Joe P. Leniski, Jr.
Joe P. Leniski, Jr. (TN BPR 22891)
Tricia Herzfeld (TN BPR 26014)
**HERZFELD, SUETHOLZ, GASTEL, LENISKI & WALL PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, Tennessee 37203
Telephone: (615) 800-6225
Email: joey@hsglawgroup.com
tricia@hsglawgroup.com

Peter J. Jannace*
**HERZFELD, SUETHOLZ, GASTEL, LENISKI & WALL PLLC**
515 Park Avenue
Louisville, Kentucky 40208
Telephone: (502) 636-4333
Email: peter@hsglawgroup.com

**PHV Application Pending*

*Attorneys for Plaintiff*